1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILL MOSES PALMER,

        Plaintiff,

    v.

SHAWN HATTON; et al.,

        Defendants.

_____/

No. C 05-358 SI (pr)

**ORDER DISMISSING TWO
DEFENDANTS AND GRANTING
SUMMARY JUDGMENT IN FAVOR
OF OTHER DEFENDANTS**

**INTRODUCTION**

    This case is now before the court for consideration of the motion for summary judgment filed by the county defendant and the motion to dismiss and for summary judgment filed by the state defendants.  For the reasons discussed below, the motions will be granted.

**BACKGROUND**

A.    <u>Excessive Force Evidence</u>

    This action concerns the use of force on Will Moses Palmer while he was in Monterey County Superior Court on July 16, 2004 under the escort of Salinas Valley State Prison employees.  The following facts are undisputed except as otherwise noted.

    1.    <u>The Parties</u>

    Palmer was a prisoner in the custody of the California Department of Corrections ("CDC"), serving a 55-years-to-life sentence after having been convicted of five counts of first degree murder and several counts of robbery.  He was housed at the Salinas Valley State Prison,

and was taken to the Monterey County Superior Court for proceedings in a criminal prosecution for battery on a prison staff member. In the four years before the incident in the courtroom, Palmer had been found guilty in at least eleven disciplinary proceedings for resisting and/or assaulting prison officials. He conceded that he had an anger management problem. He testified that he would become angry and violent when he felt unfairly deprived and "you did something to me physically, pushed me, or put your hands on me in any type of way. . . ." Palmer Depo., RT 32.

Defendant Vince Earland was a Monterey County deputy sheriff and was the bailiff in courtroom 4, where the incident occurred.

The other defendants were CDC employees. Defendant Roy Boles was a transportation sergeant at Salinas Valley and is in charge of a team that takes prisoners to court and escorts them at the courthouse. Defendant Boles was responsible for a transportation team on July 16, 2004, that included correctional officers Kenneth Boucher, Heather Johnson and Bridgette Brown (aka Bridgette Griewank). Defendant Shawn Hatton was not part of the transportation team that day; instead, he was in the courthouse as part of an internal affairs audit and decided to watch court proceedings in courtroom 4. Hatton sat in the back row of the public seating area of courtroom 4, and joined the fray when he saw Palmer scuffling with the other officers.

2.    The Incident

Palmer was one of three inmates from Salinas Valley who were in courtroom 4 on July 16 for scheduled hearings. All three inmates were seated in the jury box, as were the correctional officers from the transportation team. The jury box was next to a door to a non-public hallway. Where the door opened into the courtroom there was a small landing, apparently about three feet by three feet in size. On one side of the landing were 2-3 steps up to the jury box (which had two rows of seats, with a step between the rows) and on the other side of the landing was a 3-foot high panel, next to which were the witness stand and judge's bench.

Palmer was wearing restraints. His handcuffs were secured by a waist chain, with his hands shackled in front of him. He also was wearing leg irons, which attached to his ankles and

2

allowed him to walk in a shuffling motion.

Before court was in session, Palmer's attorney attempted to give him a pad of paper but correctional sergeant Boles wouldn't let him do so. Palmer thought that was "petty." Palmer Depo., RT 103. Boles explains that he prevented the passing of the pad "because it could have contained contraband and inmates generally should bring writing implements with them to court." Boles Decl., ¶ 5.

When Palmer's case was called, he tried to exit the jury box to go to the attorney's table. Bailiff Earland quickly approached, put his hand on Palmer's arm and stopped him. Palmer told Earland to get his hand off him. (The parties dispute whether Palmer used a profanity in telling Earland to get his hand off him.) Bailiff Earland sent Palmer back to the seat in the jury box.

Palmer was in court that day for a hearing related to the upcoming trial in his criminal case. His attorney needed a continuance but Palmer did not want to further delay his criminal trial to accommodate his attorney's schedule so he decided to make a <u>Faretta</u> motion to represent himself. The judge apparently had Palmer fill out <u>Faretta</u> paperwork in the jury box while she conducted the hearing in another inmate's case. Palmer disrupted the other inmate's case with commentary and/or questions about his own case. Eventually, the judge returned her attention to Palmer's case.[1] The judge granted Palmer's <u>Faretta</u> motion. Palmer requested that defense attorney Herro be directed to turn over his case file. The judge directed attorney Herro to turn over the file (except one item produced in discovery) to Palmer. As Herro was gathering the materials to give to Palmer, defendants attempted to get Palmer to leave the courtroom, and thus began the use-of-force incident.

Palmer states that when his case "was like going to end. When [the judge] said it was ending, that's when they approached" him. RT 123. The judge indicated to bailiff Earland that

---

[1] The parties disagree about Palmer's attitude and disruptiveness of the court proceedings. The bailiff and correctional staff believed Palmer was being disrespectful and argumentative with the judge. Palmer said it was a "dialog" with the judge. Palmer Depo., RT 111. He may have used profanity but that was "just a habit," and he may have interrupted the judge but didn't think he was being disrespectful. <u>Id.</u> at 117-118. He does, however, remember that the judge told him at some point to be quiet and to stop interrupting. <u>Id.</u> at 120.

she was finished with Palmer's case, Earland informed the correctional officers that it was time to remove Palmer from the courtroom, and correctional officers approached while attorney Herro was removing papers from a folder. Correctional officer Boles approached Palmer and told him "Let's go," directing Palmer to leave before he received his legal documents. The officers attempted to cause Palmer to leave the courtroom.

The parties disagree as to what happened next, although Palmer admits that he physically resisted the CDC officers' orders for him to leave:

> Plaintiff continued to plead his case, and braced hissself to prevent defendants from being able to push and pull Plaintiff out of the courtroom. [¶] Defendant then became extremely aggressive, defendant Boucher shoved plaintiff from the left while defendant Boles continued pulling plaintiff by plaintiff's right bicep. The combined forced broke plaintiffs resisting stance, causing plaintiff to stumble towards the right over a jury seat and into Defendant Boles. [¶] Defendant Boles also tripped over a juryseat, but retained a grip on plaintiffs bicep pulling plaintiff along with him down the steps, and towards the exiting rear courtroom door. [¶] Defendants V. Earland and S. Hatton, responded and assisted M. Johnson, B. Griewank, K. Boucher, and R. Boles to take plaintiff to the floor.

Amend. Complaint, p. 5 (errors in source). Palmer disputes that he intentionally rammed any CDC officer, but concedes that at least his shoulder probably made contact with Boles' body as they went down, that he landed atop Boles and that his head ended up in officer Johnson's midsection pinning her against the door. While Palmer describes them as inadvertent collisions, the CDC guards and bailiff saw the events as intentional head-butting and ramming by Palmer.

The parties agree that the group ended up in a pile on the floor, in and about the small landing area and jury box. Palmer states that someone pulled his chain from the back and he was pushed to the ground with his face on the steps. Palmer Depo. RT 146. He also states that his ankles were twisted, his legs stood upon, and his head held down. Amend. Complaint, p. 5. He was trying to move his body (so that he could breathe and avoid a painful position (as he claims) or to resist (as defendants claim)) and wiggling to get one of the officers off him. He believes he was on the floor for "probably like a minute, lower than a minute," and the judge told everyone to calm down. Palmer Depo., RT 155. He states that officer Hatton picked him up in a choke hold with his arm around Palmer's neck, pulled him out of the courtroom, and took him down the hallway, not letting Palmer's feet touch the ground until they exited the courthouse. An officer's feet got tangled in the leg irons and the officer untangled them. Palmer

1   states that Hatton slammed him into the hallway wall four times when he was carrying him with

2   the choke hold, telling Palmer to "shut up" when Palmer complained he couldn't breathe. Palmer

3   Depo., RT 165. (Although Palmer calls it a "choke hold," the hold was loose enough that Palmer

4   was able to vocalize complaints that it was impeding his breathing.) Once outside the

5   courthouse, Hatton let Palmer walk, but stepped on his leg irons while pulling at his neck.

6   Palmer Depo., RT 164.[2]

7        The parties dispute whether Palmer resisted at the car, although they agree that eventually

8   he was picked up and put in head first. Palmer spit blood as he entered the car; he "wasn't trying

9   to spit on them, but they tried to make it like I intentionally tried to spit on them." Palmer Depo.,

10  RT 173. Palmer states that Boucher went around the other side of the car, pulled him in to the

11  car and struck him in the head with a closed fist before closing the door.

12       Palmer states that he suffered facial injuries and mental injuries and aggravated a pre-

13  existing back problem. Palmer Depo., RT 214. The photographs of Palmer taken on the day of

14  the incident show very minimal visible injuries. See Garcia Decl., Exhs. A, B. The

15  photographs show that Palmer had a small cut on his left cheek, a small abrasion about the size

16  of a penny on his right inner ankle and a very small cut on his left big toe. There were no visible

17  marks on his hands, knees, neck or torso. The photos depict Palmer as very muscular.

18       Defendants also state they were injured. Deputy Earland states that he suffered a sprained

19  arm and a pinched nerve in his neck, and had hit his left hip on a wall during the struggle.

20  Sergeant Boles states he had pain and abrasions along the right side of his body and had

21  tendinitis in his right arm and wrist for months. Officer Boucher states that he had pain and

22  abrasions on his leg and the side of his head and suffered chronic back pain. Officer Johnson

23  _____

24      [2]Hatton disputes that he was the officer who took Palmer down the hallway. Hatton
     believes that Palmer may have confused him with correctional officer Breton because they have
25   some similar physical characteristics.

26       Palmer states that the leg irons were repeatedly stepped on by Hatton and that caused
     them to repeatedly cut into his ankles. The photographs taken after the incident indicate only
27   a minor abrasion on one ankle and not reddened rings around the ankles. See Scott v. Harris,
     127 S. Ct. 1769, 1776 (2007) (on summary judgment, court may reject a version of the facts that
28   is "blatantly contradicted by the record").

5

states that she sustained pain and redness in her abdomen and right arm.

As a result of the July 16 incident, Palmer was charged in Monterey County Superior Court with battery and obstructing/resisting an executive officer in the performance of his duties, see Cal. Penal Code § 69. He was acquitted of battery but convicted of obstructing/resisting an officer. Palmer states that, at his trial, he "admitted to resisting the officers [sic] order, by way of not leaving upon being directed to leave and by bracing hisself and physically resisting being removed from the courtroom." Palmer Decl., ¶ 39. He further states: "My conviction is based on me admitting to resisting the officers [sic] order to leave the courtroom, and not on any of the events that occurred after I refused to leave." Id. at ¶ 42. The conviction on the § 69 offense meant that the jury found that Palmer "knowingly and unlawfully resisted an executive officer in the performance of his or her duty" and "[t]he resistance was accomplished by means of force or violence." CALJIC 7.50.

Some defendants knew Palmer was in court because he was criminally charged with battering a correctional staff member. To defendants, Palmer appeared agitated during the court proceedings, as well as disrespectful and argumentative. Once the struggle began, defendants were concerned about Palmer gaining access to the correctional officers' firearms because at least two correctional officers were wearing pistols. Deputy Earland also was concerned that the two other inmates in the jury box might join in the fray, escape or otherwise be disruptive.

B.    Facts Regarding Administrative Remedies Exhaustion

In addition to asserting an Eighth Amendment claim against several defendants, Palmer asserted a due process claim against defendants Salazar and Sanchez for acts and omissions at the disciplinary proceedings resulting from the courtroom incident. Defendant Salazar was the hearing officer and defendant Sanchez (originally identified as a Doe defendant) was the investigative officer at a disciplinary hearing for a charge of battery on an officer based on the incident in the courtroom. Salazar allegedly refused to allow Palmer to present witnesses and evidence. Sanchez allegedly failed to obtain requested evidence and witnesses.

Palmer filed his complaint in this action on January 25, 2005, and filed his amended

1    complaint on September 25, 2005. His inmate appeal concerning the discipline concluded when

2    the director's level decision on his inmate appeal was issued on May 19, 2005.

3

4    **VENUE AND JURISDICTION**

5    Venue is proper in the Northern District of California because the events or omissions

6    giving rise to the claims occurred in Monterey County, which is located within the Northern

7    District. See 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this

8    action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

9

10    **DISCUSSION**

11    A.    Defendants' Motion To Dismiss

12    Defendants Salazar and Sanchez move to dismiss the due process claim on the ground

13    that Palmer did not exhaust administrative remedies before filing this action. Palmer opposes,

14    contending that he did exhaust before he filed his amended complaint.

15    "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983],

16    or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility

17    until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The

18    State of California provides its inmates and parolees the right to appeal administratively "any

19    departmental decision, action, condition or policy perceived by those individuals as adversely

20    affecting their welfare." See Cal. Code Regs. tit. 15, § 3084.1(a). In order to exhaust available

21    administrative remedies within this system, a prisoner must proceed through several levels of

22    appeal: (1) informal resolution, (2) formal written appeal on a CDC 602 inmate appeal form, (3)

23    second level appeal to the institution head or designee, and (4) third level appeal to the Director

24    of the California Department of Corrections. See id. § 3084.5; Ngo v. Woodford, 126 S. Ct.

25    2378, 2383 (2006); Barry v. Ratelle, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997).

26    Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. Porter v. Nussle, 534

27    U.S. 516, 524 (2002). All available remedies must be exhausted; those remedies "need not meet

28    federal standards, nor must they be 'plain, speedy, and effective.'" Id. (citation omitted). Even

7

when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit. Id.; Booth v. Churner, 532 U.S. 731, 741 (2001).

A prisoner's failure to exhaust administrative remedies is an affirmative defense. See Jones v. Bock, 127 S. Ct. 910 (2007). Defendants have the burden of raising and proving the absence of exhaustion. Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003). The proper way to establish nonexhaustion is by a unenumerated Rule 12(b) motion rather than in a motion for summary judgment because the "failure to exhaust nonjudicial remedies that are not jurisdictional should be treated as a matter in abatement." Id. "In deciding a motion to dismiss for a failure to exhaust nonjudicial remedies, the court may look beyond the pleadings and decide disputed issues of fact" with regard to the defense. Id. at 1119-20.

Defendants present evidence showing that Palmer did not pursue his inmate appeals to the highest level (i.e., the director's level) and receive a decision from that highest level before filing this action with regard to his claim against Salazar and Sanchez. He filed an inmate appeal, but did not receive the director's level decision until several months after filing this action. He did not exhaust administrative remedies before filing the action, as required by § 1997e(a).

Palmer argues that he satisfied the exhaustion requirement because he did not file his amended complaint until after the inmate appeal was completed. The fact that Palmer completed exhausting his administrative remedies after he filed this action but before he filed his amended complaint does not help him because the statute requires exhaustion before the action is filed, and not while the action is pending. McKinney v. Carey, 311 F.3d 1198, 1199 (9th Cir. 2002); see Vaden v. Summerhill, 449 F.3d 1047, 1051 (9th Cir. 2006).

Palmer also argues that exhaustion to the highest level in the prison system should be excused because he was acquitted in criminal court of the battery charge on January 6, 2005, before he filed this action, and the acquittal "provided Plaintiff with all the relief available." Opposition Brief, p. 13. He is wrong. The acquittal does not matter for exhaustion purposes. The acquittal provided an additional ground on which to challenge the prison disciplinary decision, but further action was required by prison officials who had to examine the state court

8

proceedings and determine how they impacted the disciplinary decision. That the acquittal did not have a self-executing power over the disciplinary decision is evident by the fact that Palmer still had to pursue an inmate appeal to seek the requested relief based on the acquittal. Even the director's level decision issued five months after the acquittal did not completely resolve the issue but instead – like a remand from an appellate court – told the Salinas Valley officials to determine whether the acquittal required any change in the disciplinary decision. Specifically, the director granted the appeal in part, stating that the prison "shall review the RVR in conjunction with the associated court proceedings and take the appropriate course of action relative to CCR 3316," a regulation that allowed a disciplinary charge to be dismissed if the inmate was found not guilty in a criminal court proceeding after being found guilty in a disciplinary hearing. See Grannis Decl., Exh. A. The director's level decision indicates that Palmer's inmate grievance started out as a complaint about the hearing officer and investigative employee's failure to consider and obtain witnesses and evidence, and that argument had been rejected in the second level decision, but at the director's level, Palmer argued that he had been found not guilty of battery in the criminal proceedings. In short, five months after the acquittal, the director's level decision was that the prison officials had to consider whether the disciplinary decision should be changed on account of the acquittal. It can hardly be said that the acquittal of the battery charge provided Palmer all the relief he needed; had he not pursued the inmate appeal, he apparently would have served the entire 18-month SHU term imposed in the disciplinary proceeding rather than just a part of it.

The court finds that Palmer did not exhaust his administrative remedies before filing this action for his claim against defendants Salazar and Sanchez. The claim must be dismissed under § 1997e(a). Only the unexhausted claims (and not the entire action), must be dismissed for non-exhaustion where there remain other potentially exhausted claims. Jones v. Bock, 127 S. Ct. at 925-26. The due process claim is independent of the Eighth Amendment claim and involves different defendants, so dismissal of the claim will not impede resolution of the other claim. The due process claim against defendants Salazar and Sanchez is dismissed without prejudice for failure to exhaust administrative remedies before filing this action.

B.    The Summary Judgment Motions

    1.    Legal Standards For Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, as is the situation with defendants' challenge to the Eighth Amendment claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

Where, as is the situation with defendants' qualified immunity defense, the moving party bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. See Houghton v. Smith, 965 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense. Id. at 1537; see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it

is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Palmer's verified amended complaint is considered in opposition to the motion for summary judgment.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631.

2.    Analysis Of Merits Of Eighth Amendment Claim

A prisoner has the right to be free from cruel and unusual punishment, including physical abuse by guards. Whenever prison officials stand accused of using excessive physical force in violation of the Eighth Amendment, the core judicial inquiry is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson v. McMillian, 503 U.S. 1, 6 (1992) (citing Whitley v. Albers, 475 U.S. 312, 317 (1986)). In determining whether the use of force was for the purpose of maintaining or restoring discipline, or for the malicious and sadistic purpose of causing harm, a court may evaluate the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. See Hudson, 503 U.S. at 7; see also Spain v. Procunier, 600 F.2d 189, 195 (9th Cir. 1979).

Viewing the evidence in the light most favorable to Palmer and applying the several Hudson factors to the evidence before the court leads to the conclusion that the force used by defendants did not violate Palmer's Eighth Amendment rights and no reasonable jury could find otherwise.

There was a need for the use of some force against Palmer, and the amount of force used was in reasonable proportion to that need. Palmer refused to comply with the order to leave the courtroom and instead physically resisted correctional staff, bracing himself to prevent being moved.[3] No physical force was used until Palmer physically braced himself to resist movement. The group struggled and ended up in a pile on the floor of the courtroom. Palmer disputes that he intentionally rammed any CDC officer, but does not dispute that at least his shoulder contacted officer Boles, he landed atop officer Boles, and his head ended up in officer Johnson's midsection. Palmer continued to struggle while on the ground and defendants used force to secure him on the floor of the courtroom. Even accepting as true Palmer's statement that the defendants were bending his legs and yanking on the waist chain or leg irons, it is undisputed that Palmer continued to physically move around on the floor and the defendants were trying to gain control over a very strong wiggling or thrashing inmate. Palmer was carried out of the courtroom and was shoved into the hallway wall face-first four times. Palmer does not dispute defendants' evidence that he was pushed up against the wall in connection with defendants' efforts to regain their grip on him as they took him down the hall. He was shoved into the car and, after spitting, was punched.[4]

The extent of the injuries inflicted was not great. Palmer states that he suffered the aggravation of a previous back injury, but that occurred during the scuffle in the courtroom during which Palmer was using force or violence to resist the officers. He also had small cuts and an abrasion on his right ankle, but those injuries were not serious enough to warrant any

---

[3]Although there may not have been an elaborately worded order to Palmer to leave, Palmer does not contend that he did not understand what was expected of him. The evidence is undisputed that he braced himself in anticipation of correctional staff's efforts to move him.

[4]Although defendants deny that Palmer was punched when he was put in the car, on summary judgment the court accepts the non-movant's version of the incident as true. Even accepting as true Palmer's assertion that Boucher hit Palmer after Palmer spit, however, it does not appear to rise to the level of cruel and unusual punishment. It appears instead to be a de minimis use of physical force against a prisoner signalling continued defiance by spitting that is not of a sort "repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10. See id. at 9 (citation omitted) ("'Not every push or shove, even if may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'")

medical treatment and of the sort normally ignored or addressed with a band-aid. The defendants sustained comparable injuries to Palmer's.

The threat reasonably perceived by the correctional staff was significant. They believed Palmer to be a threat to their own safety and to that of other persons in the courtroom. From the correctional staff's perspective, Palmer was an agitated inmate in a public place who had decided he wasn't going to willingly move and comply with officer's orders. He was already in restraints but these did not completely immobilize him as he was able to and did struggle against the guards. And even though he was in these restraints, he was in immediate physical contact with guards when they ended up in a pile in the small landing area and could have gained access to the guards' firearms. At the time of the incident, the defendant correctional officers were aware that Palmer had a significant history of misbehavior against staff, had to be physically removed from courtrooms on prior occasions, and appeared to be agitated and disrespectful/disruptive in court.

Correctional staff apparently attempted to temper the severity of their response by first giving Palmer a verbal command before any force was applied. Even Palmer's description indicates that the event started with a polite (albeit untimely) nudge to get moving.[5] The use of force only began when Palmer physically resisted efforts to make him move.

Palmer devotes considerable energy to his ideas that defendants were unreasonable and that he could rightfully refuse to comply with an order to move unless and until he obtained his legal file from his attorney. Indeed, he suggests that *any* force was excessive under the circumstances. He appears to believe that he had no obligation to comply with the order until he received his legal papers. The law does not support his view. If an inmate disagrees with the lawfulness of an order, he can file an inmate grievance and perhaps a court case. There may be that extremely rare situation where the order is so blatantly illegal and dangerous – such as a command to "come over here so I can shoot you in the face" -- that a prisoner might rightfully

---

[5] "It wasn't like no first – like he came up beside me and just like grabbed it, like come on or nothing like that. He just more like kind of nudged me like come on Palmer, let's go." Palmer Depo., RT 124.

disobey the order, but this wasn't such a situation, nor did it come anywhere near to being such a situation. The correctional staff's failure to allow him to obtain his legal file is, in a nutshell, legally irrelevant. When he was told to move by the correctional staff, he had to move. To rule otherwise would result in chaos in the prisons by making compliance with orders negotiable and optional. (This is not to say that disobedience of an order gives prison officials carte blanche to use whatever force they choose on the disobedient prisoner, as their conduct is subject to judicial and administrative review.)

The undisputed evidence shows that, at the time Palmer was subjected to the force, the guards confronted a situation where a strong inmate was in a public courtroom being defiant and refusing to leave voluntarily and continued to struggle even after force was used on him. Viewing the evidence in the light most favorable to Palmer, no reasonable jury could find that defendants applied force maliciously and sadistically for the very purpose of causing harm instead of maintaining or restoring discipline. Palmer failed to establish a triable issue of fact that the force used was excessive. His failure to establish a triable issue of fact on the use of excessive force also requires the rejection of his claim that defendants who did not use force are liable for failing to intervene to prevent the use of excessive force by the defendants who did use force. That is, if there was no excessive force, no one has liability for failing to prevent excessive force. Defendants are entitled to judgment as a matter of law on the Eighth Amendment claim.

3.    Qualified Immunity Defense

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The rule of qualified immunity "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" Burns v. Reed, 500 U.S. 478, 495 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a particular

sequence of questions to be considered in determining whether qualified immunity exists. The court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. See id. If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

The first step under Saucier is to determine whether there was a constitutional violation. As discussed above, the evidence in the record does not establish an Eighth Amendment violation. The analysis need not proceed to the second step of the Saucier analysis.

Even assuming arguendo that there was a violation of Palmer's Eighth Amendment rights, Palmer's claim would fail on the second prong because it would not have been clear to reasonable officers that using the force they allegedly did to remove the prisoner from the courtroom and courthouse was excessive under the circumstances they faced. The qualified immunity inquiry is deferential to the government official; "[t]he scenario may look different when gauged against the '20/20 vision of hindsight,' but [a court] must look at the situation as a reasonable officer in [the deputy's] position could have perceived it." Marquez v. Gutierrez, 322 F.3d 689, 693 (9th Cir. 2003). The circumstances presented to the defendants included the following: A very muscular inmate who, although already in handcuffs, waist chain and leg irons, chose to physically resist instead of comply with an order to move. The incident started in a public courtroom and continued down a hallway and out to the vehicle – all places where bystanders (including court personnel) could have been hurt had the prisoner not been controlled. Also in the courtroom were at least two other prisoners who had the potential to join in the fray, creating an even greater threat to security. Palmer rammed into one officer and went

head-first into another officer. At least two of the correctional officers were wearing firearms, to which Palmer could have gained access during the struggle. Once on the ground, Palmer continued to struggle against the officers. Even as they moved down the non-public hallway, the group was still in a non-secure place as court staff and judges used that hallway. Palmer does not dispute that the officers were attempting to regain their grip on him when they shoved him face-first into the wall. And Palmer doesn't dispute that he spit before being hit in the head in the car. Palmer had a known history of disruptive and assaultive behavior against correctional staff and had a known history of having been physically removed from a courtroom. Even if the defendants' acts amounted to excessive force, it was a reasonable mistake in light of the situation as it appeared to them. Defendants are entitled to judgment as a matter of law on the qualified immunity defense.

## CONCLUSION

The motion to dismiss by defendants Salazar and Sanchez for failure to exhaust is GRANTED. (Docket # 73.) The claims against those defendants are dismissed without prejudice to plaintiff filing a new civil rights complaint in which he asserts these claims, but only after he has exhausted his administrative remedies as to each claim alleged in such a complaint. The motion for summary judgment filed by defendant Earland and the motion for summary judgment filed by defendants Boles, Johnson, Boucher and Hatton are GRANTED. (Docket # 62, 73, 84). Judgment will be entered in their favor.

IT IS SO ORDERED.

Dated: January 14, 2008

SUSAN ILLSTON
United States District Judge